


```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/6/16
```

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

ZACHARY W. CARTER
*Corporation Counsel*

DANIEL PASSESER
Senior Counsel
phone (212) 356-2377
fax (212) 356-3509
email dpassese@law.nyc.gov

August 25, 2016

BY ECF
Honorable Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

9/6/2016 — I affirm Judge Pitman's ruling, which was not clearly erroneous. — Colleen McM

Re: *Erica Vasconcellos v. City of New York*,
12 Civ. 8445 (CM)(HBP)

Your Honor:

MEMO ENDORSED

I am the Assistant Corporation Counsel in the Special Federal Litigation Division of the New York City Law Department representing defendant City of New York in the above-referenced matter. Defendant writes in response to plaintiff's August 5, 2016 objection (which was not docketed) to Magistrate Judge Pitman's July 26, 2016 order denying plaintiff's motion to compel certain discovery. (Docket No. 195.) Judge Pitman's ruling was correct in all respects and therefore plaintiff's application should be denied.

### I. Pre-Employment Psychological Test Results

Every applicant to be a uniformed member of service with the NYPD, prior to being hired, is interviewed by a psychologist employed by the NYPD. Based on that interview, the psychologist makes a recommendation to either grant or deny employment. The recommendation is what is reviewed by the NYPD in making the employment decision. The underlying psychological examination file itself is kept confidential and is not disseminated unless the officer puts the test results at issue. (See Declaration of Dr. Eloise M. Archibald, NYPD Psychologist, annexed hereto as Exhibit A at ¶¶ 9–19.)

There are several reasons this level of confidentiality is warranted. First, psychological screening is necessarily intensely personal, and for that reason psychological records are subject to a host of privacy protections in general. These officers are non-parties to this litigation, and they have not put their mental health or psychological state at issue. Second, the examinations themselves are confidential, because were they to leak, potential applicants

could prepare for the examination in a way that would allow unfit applicants to pass the psychological screening portion, which would impair the NYPD's ability to screen out mentally unstable applicants. (Exhibit A at ¶¶ 5–8.) To the extent plaintiff will argue that an attorneys' eyes only confidentiality order can alleviate this concern, defendants disagree. See Dinler v. City of New York, 607 F.3d 923, 935–37 (2d Cir. 2010) ("Even if the 'attorneys' eyes only' procedure works in some *commercial* litigation, as well as some criminal cases . . . the consequences of accidental disclosure are too severe to employ the procedure here.").

Finally, plaintiff wholly lacks any good-faith basis to believe that there is anything in these non-party officers' pre-employment psychological screening files that would put the NYPD on notice that years later, they would shoot Dashawn Vasconcellos. Det. Ramos was appointed to the NYPD in 1992, Sergeant Zacarese was appointed in 1999, and Sergeant Cruzado and Detective Myers were appointed in 2004. Their pre-employment psychological screening tests are too far removed from the shooting incident in 2009 to be relevant to this case. Plaintiff's theory is a pure fishing expedition.

Nevertheless, if the Court is inclined to grant plaintiff's application as to these files, defendant respectfully requests that the Court first review these files *in camera*, so that the Court can make a determination as to whether there is anything contained therein to which the City was arguably deliberately indifferent when it appointed these men to be NYPD officers.

## II.   Firearms Discharge Review Board Files

Plaintiff's motion for a pre-motion conference before Judge Pitman (which was not docketed) did not mention these files, and, as a result, defendant's opposition did not mention them either. (Docket No. 192.) Therefore, defendant addresses these files for the first time here. Every time an NYPD member of service discharges their firearm while on duty, the "Shooting Team" assigned to the Borough in which the discharge occurred investigates the discharge. The Shooting Team's investigation is sent to the Firearms Discharge Review Board ("FDRB"). The FDRB meets, reviews the investigation, and makes a finding as to whether the discharge violated Department Guidelines. This is true in every firearms discharge case, whether an officer shot a civilian, an animal, or even if the officer dropped his firearm on the ground and it discharged a bullet into a wall. From 1999 to 2009, the relevant period for plaintiff's document request, there were approximately 1,376 such investigations. (Pl's Fourth Set of Document Requests, Docket No. 192-2 at ¶¶ 3–36.)

To give the Court a sense of scope, the FDRB file for the shooting of Dashawn Vasconcellos (which was produced in this case at D2347 – D2849) is 502 pages. Plaintiff's document demands could therefore be seeking an estimated 688,000[1] pages, all of which would need to be carefully reviewed and redacted in order to prevent the disclosure of the personal information (and often sealed arrest information) of civilians, both those who were shot and witnesses, as well as the personal information and disciplinary history of police officers. Furthermore, these files are not stored in a central electronic database. They are stored in hard

---

[1] 500 x 1,376 = 688,000.

copy, and they are kept in the various boroughs in which the shootings occurred. To collect all these files would be a monumental undertaking, and to review and redact them would take thousands of hours.[2]

Seemingly cognizant of the ridiculous nature of his document requests, plaintiff proposes, for the first time, a new limitation on his own demand—that the City only be directed to produce FDRB files "in which an officer fired multiple shots at a single individual, using an automatic, or semi-automatic weapon, or any weapon which can hold more than 6 rounds of ammunition." (Pl. R. 72 Obj. at p. 12.)[3] First, this limitation was never proposed to defendant, was not the subject of any meet and confer between the parties, and was not ruled upon by Judge Pitman. It is therefore not properly before the Court on this application. Even if it were, there is no system for identifying such files. To determine which files meet these criteria, defendant would still have to review all of the files.

To justify imposing such a burden on defendant, proportionality would require plaintiff to demonstrate that these files were critical to her case. Plaintiff posits that the files contain "information regarding what the City learned about firearms it was issuing to police officers, and whether they trained and supervised the particular police officers properly in light of that information." (Pl. R 72 Obj. at p. 7.) In reality, they contain neither.

The FDRB files do not contain training information. Training information is contained in the several thousand pages of training materials produced by defendant on February 29, 2016. (See Docket No. 192-3 at Response to Request Nos. 1–2.) They also do not contain information about supervision of the police officers at issue in this case, as plaintiff has not limited his request to files of shootings in which the subject officers in this matter were involved, presumably because there are no prior shootings in which the subject officers in the matter were involved.

Finally, plaintiff asserts that "reviewing these files will lead to admissible evidence that the City had a policy of ignoring a pattern in shootings involving specific weapons which resulted in unnecessary and avoidable death and injury . . . ." (Pl. R 72 Obj. at p. 9.) Defendant can only guess at Mr. Colihan's theory here. The weapons issued by the City to

---

[2] Plaintiff avers, without citation, that these files "appear to have been gathered already and provided to the Rand Corporation." Plaintiff is presumably referencing the RAND Report, excerpts of which are annexed hereto as Exhibit B. What was actually provided to the RAND Corporation was "complete files of all firearm-discharge cases that were completed from 2004 to present [the Report was published in 2008]," not including "cases in which officers shot at dogs or those in which accidental discharge did not result in injury or death to a person." (Exhibit B at p. 2.) The RAND Report specifically notes that they were able to examine "almost 200 firearm-discharge cases." (Id.) That is a far cry from nearly 1,400.

[3] Defendant notes that the pages in plaintiff's letter application are not numbered, and that defendant is not counting the fax cover sheet as page 1.

3

NYPD officers are a matter of public record and training materials on those weapons have been produced. Plaintiff is free to argue that in 2009, the City of New York (and every other major City in the United States which issues similar equipment) was deliberately indifferent to the constitutional rights of its citizens because it allowed police officers to use firearms that can hold more than six bullets. It is not clear what the value of the FDRB files would be to such an argument.

Balancing the extraordinary burden of locating, collecting, reviewing, and redacting these files against their dubious relevance to the claims in this case, it is clear that Judge Pitman was correct in sustaining defendant's objection to producing same.

Thank you for your consideration herein.

Respectfully Submitted,

/s/

Daniel Passeser
Senior Counsel

CC: BY ECF
Michael Colihan
44 Court St. Suite 906
Brooklyn, NY 11201
michaelcolihan@aol.com